**GRAHAM CREEK FARMS, Petitioner,**

v.

**INDIANA DEPARTMENT OF STATE REVENUE, Respondent.**

No. 49T10–0007–TA–87.

Tax Court of Indiana.

Dec. 13, 2004.

---

Corrine R. Finnerty, McConnell & Finnerty, North Vernon, IN, Attorney for Petitioner.

Steve Carter, Attorney General of Indiana, Linda I. Villegas, Deputy Attorney General, Indianapolis, IN, Attorneys for Respondent.

FISHER, J.

Graham Creek Farms (Graham) challenges the final determination of the Indiana Department of State Revenue (Department) denying its claim for refund of sales and use tax paid for the 1993, 1994, and 1995 tax years (years at issue). The issue for the Court to decide is whether Graham is entitled to several sales and use tax exemptions for certain items purchased for use in its farming operation.

## FACTS AND PROCEDURAL HISTORY

Graham is a partnership engaged in farming in Jennings County, Indiana. Graham farms 6,975 acres of land, raising: corn, soybeans, wheat, alfalfa, hay, burley tobacco, Angus beef cows, and during the years at issue, turkeys. Graham also operates a shop where it performs repairs and maintenance on its farm equipment.

After conducting an audit, the Department determined that Graham had not paid sales tax on many items it purchased for use in its farming operations. The Department issued proposed assessments for the years at issue totaling $9,945.82. Graham protested the assessments; the Department issued a Letter of Findings on August 19, 1999, substantially upholding the assessments. Graham paid the tax and filed a claim for refund on February 23, 2000. On April 24, 2000, the Department denied Graham's claim for refund.

Graham initiated an original tax appeal on July 20, 2000. A trial was held on April 27, 2001, and the Court heard the parties' oral arguments on November 20, 2001. Additional facts will be supplied as necessary.

## ANALYSIS AND OPINION

### Standard of Review

■ Final determinations of the Department regarding claims for refund are subject to *de novo* review. *See* IND.CODE ANN. § 6–8.1–9–1(d) (West Supp.2004). The Court is therefore not bound by either the evidence presented or the issues raised at the administrative level. *See Snyder v. Indiana Dep't of State Revenue,* 723 N.E.2d 487, 488 (Ind. Tax Ct.2000), *review denied.*

■ Graham claims that its purchases of the subject farming equipment and supplies are exempt from sales and use tax. Accordingly, Graham bears the burden of showing how the items it purchased clearly fall within the exemption statute. *See Foursquare Tabernacle Church of God in Christ v. State Bd. of Tax Comm'rs,* 550 N.E.2d 850, 854 (Ind. Tax Ct.1990). While the exemptions will be strictly construed against Graham, the Court will not read them so narrowly as to defeat their application to the case if it is rightly within their ambit. *See Tri–States Double Cola Bottling Co. v. Dep't of State Revenue,* 706 N.E.2d 282, 283–84 (Ind. Tax Ct.1999).

### Discussion

### GENERAL PRINCIPLES

Indiana imposes sales tax "on retail transactions made in Indiana." IND.CODE ANN. § 6–2.5–2–1(a) (West 2004). Indiana also imposes a use tax—which is the functional equivalent of the sales tax—on the acquisition of certain non-exempt tangible personal property that has escaped sales tax, usually because the property was acquired in a transaction that occurred outside of Indiana. *See Rhoade v. Indiana Dep't of State Revenue,* 774 N.E.2d 1044, 1047–48 (Ind. Tax Ct.2002).

Indiana Code §§ 6–2.5–5–1 and –2 exempt tangible personal property used in agricultural production. Specifically, Indiana Code § 6–2.5–5–1 provides:

[t]ransactions involving animals, feed, seed, plants, fertilizer, insecticides, fungicides, and other tangible personal property are exempt from [sales] tax if:

(1) the person acquiring the property acquires it for his direct use in the direct production of food and food ingredients or commodities for sale or for further use in the production of food or commodities for sale; and

(2) the person acquiring the property is occupationally engaged in the production of food and food ingredients or commodities which he sells for human or animal consumption or uses for further food and food ingredient or commodity production.

IND.CODE ANN. § 6–2.5–5–1 (West Supp. 2004). Indiana Code § 6–2.5–5–2 provides that

(a) Transactions involving agricultural machinery, tools, and equipment are exempt from the [sales] tax if the person acquiring that property acquires it for his direct use in the direct production, extraction, harvesting, or processing of agricultural commodities.

(b) Transactions involving agricultural machinery or equipment are exempt from the [sales] tax if:

(1) the person acquiring the property acquires it for use in conjunction with the production of food and food ingredients or commodities for sale;

(2) the person acquiring the property is occupationally engaged in the production of food or commodities which he sells for human or animal consumption or uses for further food and food ingredients or commodity production; and

(3) the machinery or equipment is designed for use in gathering, moving, or spreading animal waste.

IND.CODE ANN. § 6–2.5–5–2 (West Supp. 2004).

■ Both of these exemption provisions require a taxpayer to be engaged in production[1]; however, a taxpayer must also show how the tangible personal property for which it seeks an exemption is *directly* used in its production process.[2] *See Indianapolis Fruit Co. v. Dep't of State Revenue*, 691 N.E.2d 1379, 1383 (Ind. Tax Ct.1998). In other words, the tangible personal property for which the taxpayer seeks the exemption must be integral and essential to its production process, a determination that is often made by identifying the points where production begins and where it ends. *Id.* at 1383–84. As this Court has previously explained:

> A finding that production is taking place will often lead to a taxpayer receiving an exemption for activity that, standing alone, does not constitute production. [Nevertheless], the item itself does not have to have a transformational effect on the good being produced in order to be exempt from sales and use tax. It is enough that the item play[s] an integral part of the ongoing process of transformation.

*Id.* at 1384 (internal quotation and citation omitted). With these principles in mind, the Court will now address each of Graham's claims for exemption.

## 1. Turkey Operation

During the years at issue, Graham raised turkeys. At approximately ten weeks of age, the turkeys were moved from a "starter" building to a "finishing" building where they remained until loaded in trucks and sent to a processing facility. (*See* Trial Tr. at 13–14.) When the turkeys were moved to the finishing building, the starter building had to be cleaned and disinfected in order to be ready for another batch of newly hatched turkeys. (*See* Trial Tr. at 99.) In the process of disinfecting the starter building, contaminated floor bedding would be cleared away and a new layer of bedding would be spread over the floor to ensure that the new batch of turkeys would not contract disease.[3] (Trial Tr. at 100–01.)

■ Graham first argues that its purchase of rain slickers for its employees is exempt because "people will not stand outside in the rain" to load the turkeys onto the truck for transport to the processing plant. (Trial Tr. at 90.) (*See also* Pet'r Ex. A at 13–14 (alluding to these slickers as safety clothing).) The Department argues that because the rain slickers are not necessary to prevent injury or prevent contamination of the turkeys, they are taxable. (*See* Resp't Br. at 5.) The Department is correct.

The purchase of "[s]afety clothing ... which is required to allow a farmer to participate in the production process without injury or to prevent contamination of

---

1. The parties do not dispute that Graham is occupationally engaged in the production of food and agricultural commodities for sale.

2. "'To be directly used ... in the direct production of food or agricultural commodities' requires that the property in question must have an immediate effect on the article being produced. Property has an immediate effect on the article being produced if it is an essential and integral part of an integrated process

which produces food or an agricultural commodity." IND. ADMIN. CODE tit. 45, r. 2.2–5–1(a) (1992) (1996).

3. The bedding consisted of a two-inch layer of either agricultural lime or a mixture of lime and gravel called "waste," covered by a three-inch layer of wood shavings. (*See* Trial Tr. at 100–02.)

the livestock or commodity during production" is exempt." IND. ADMIN. CODE tit. 45, r. 2.2–5–6(d)(11) (1992) (1996). The purchase of clothing "furnished primarily for the convenience of the workers if the workers are able to participate in the production process without it[,]" however, is taxable. IND. ADMIN. CODE tit. 45, r. 2.2–5–4(c) (1992) (1996). While Graham may have been required to provide rain slickers in order to get workers to load turkeys in the rain, no evidence was presented indicating that without the rain slickers, turkeys could not be safely loaded onto the trucks. Therefore, the purchase of rain slickers is not exempt.

■ Graham next asserts that a replacement part for a backhoe is exempt because the backhoe was used to bury dead turkeys and to move contaminated bedding that had been cleared from the starter house. (*See* Pet'r Br. at 3; Pet'r Ex. A at 21.) More specifically, Graham claims that because the backhoe is used to haul turkey waste, it qualifies as "exempt machinery." *See* 45 IAC 2.2–5–4(d)(9) (exempting the purchase of equipment designed to haul animal waste). Consequently, Graham relies on the Department's regulation that exempts the purchase of "[r]eplacement parts used to replace worn, broken, inoperative, or missing parts on exempt machinery and equipment." 45 IAC 2.2–5–6(d)(10).

The Department asserts that because the backhoe was not specifically designed to haul animal waste, and Graham has not demonstrated how it is used in the direct process of producing marketable turkeys, the backhoe is not exempt. (*See* Resp't Br. at 6.) Accordingly, the Department claims the purchase of the replacement part is, likewise, taxable. The Court agrees.

In order for equipment used to haul animal waste to be considered exempt, the purchaser must be .occupationally engaged in agricultural production and use the equipment directly in direct production of agricultural products. *See* 45 IAC 2.2–5–4(d)(9). The parties do not dispute that removing contaminated bedding from the starter house is part of the process of producing turkeys. Nonetheless, the evidence demonstrates that the backhoe was only used to move the bedding material *after* it had already been removed from the starter house. Indeed, George Corya (Corya), managing partner of Graham, testified that "[t]he backhoe was never used inside of the building; it was used on the outside, to help out." (Trial Tr. at 108.) The fact that the backhoe was a convenient way to move the discarded bedding from one area of the farm to another, or utilized to bury dead turkeys, does not demonstrate that the backhoe was directly used during the production process. Therefore, the backhoe does not qualify as exempt equipment and the repair part is taxable. *See also* 45 IAC 2.2–5–4(e) ("[t]he fact that a piece of equipment is convenient, necessary, or essential to farming is insufficient in itself to determine if it is used directly in direct production as required to be exempt").

■ Finally, Graham claims that waste it purchased for use as turkey house bedding (*see* footnote 3 *supra*) is exempt because it is an essential and integral part of the turkey raising process. The Department does not dispute that the bedding is used in the process of producing marketable turkeys. Nevertheless, the Department argues that "[t]he waste is not subject to an exemption because [Graham] has not made a prima facie case that this waste is the agricultural lime material that he used in the turkey house." (Resp't Br. at 5.) In other words, the Department argues that because Graham indicated that it also used waste in its barnyard, it cannot

be certain that this waste was solely used for turkey house bedding. (*See* Resp't Ex. 2 at 11.) The Department is incorrect.

At trial, Corya explained that Graham purchased either a mixture of agricultural lime and gravel called "waste" or pure agricultural lime (depending on availability) to be used as turkey house bedding. Corya further testified that waste was purchased for use as turkey bedding material only, and it was purchased from the Kentucky Stone Company. (*See* Trial Tr. at 101–02, 104–05; Pet'r Ex. A at 20.) The invoices containing the waste purchases Graham seeks to exempt are from the Kentucky Stone Company. (*See* Pet'r Ex. A at 20.) Accordingly, the Court concludes that Graham sufficiently proved that the waste purchases at issue were used solely for bedding in the turkey house. The Department has presented no evidence contradicting this testimony. Therefore, the Court finds that Graham is entitled to an exemption for its purchases of waste from the Kentucky Stone Company. *See Hamstra Builders, Inc. v. Dep't of Local Gov't Fin.*, 783 N.E.2d 387, 390 (Ind. Tax Ct.2003) (a taxpayer "present[s] a prima facie case by submitting probative evidence, i.e., evidence sufficient to establish a given fact that, if not contradicted, will remain sufficient").

### 2. Tobacco Operation

■ Graham produces marketable tobacco by cutting down mature tobacco stalks and attaching them to fifty-two inch sticks. (*See* Trial Tr. at 15–16.) Each stick has approximately five tobacco plant stalks attached, and weighs approximately eighty-pounds when taken to the tobacco barn. In the tobacco barn, the sticks are spread out on specially designed rails and dried for two to three months. (*See* Trial Tr. at 16.) When dried, the stalks and leaves are removed from the sticks, producing about one to one and a half pounds of marketable tobacco. (*See* Trial Tr. at 16–17.)

The tobacco barn has roof vents for ventilation and specially designed shutters along the sidewalls that can be adjusted to direct the air flow in and out of the barn. (*See* Trial Tr. at 27, 30; Pet'r Ex. B at 1.) Corya testified that if the sticks with the tobacco stalks were not hung on the rails correctly spaced apart (thereby not receiving the proper airflow) they would rot immediately (a condition known as "house burn"). (*See* Trial Tr. at 23–24, 27.) Consequently, Graham asserts that the materials and labor charges it paid to construct its tobacco barn are exempt because the tobacco barn is integral and essential to the process of producing marketable tobacco. *See* 45 IAC 2.2–5–6(b) (exempting agricultural equipment used in "the direct production ... [of] agricultural commodities").

The Department claims that the tobacco barn is not essential to the process of producing tobacco. Specifically, it asserts that "[t]he drying of the tobacco was not actively induced by the tobacco barn but was merely incidental to the proper storage of the tobacco." (Resp't. Br. at 9.) Therefore, the Department argues that because the drying process is passive, the tobacco barn does not directly affect the tobacco and is not part of the production process.[4]

---

4. The Department bases its argument on this Court's holding in *Indianapolis Fruit Co. v. Dep't of State Revenue*, 691 N.E.2d 1379, 1385–86 (Ind. Tax Ct.1998). In that case, the Court determined that the ripening of tomatoes did not constitute a part of the process of producing marketable tomatoes because the taxpayer's storage room did nothing to actively induce the ripening. *See Id.* The fact that a natural process can happen on its own, however, does not prevent it from constituting production. *Id.* at 1385 n. 3.

■ The evidence demonstrates that in the tobacco drying process, the proper circulation of air is essential to avoid "house burn." (*See* Trial Tr. at 27.) Marketable tobacco is not produced until an eighty-pound stick of tobacco stalks is dried and essentially reduced to one and a half pounds of marketable tobacco. (*See* Trial Tr. at 22.) Clearly, the drying process has a direct effect on transforming unmarketable tobacco stalks into marketable tobacco; without the tobacco barn's effect, the tobacco stalks would rot and no marketable product would be produced. *See e.g., Gen. Motors Corp. v. Indiana Dep't of State Revenue,* 578 N.E.2d 399, 404 (Ind. Tax Ct.1991) (determining that production ended when taxpayer placed products in their most marketable form), *aff'd,* 599 N.E.2d 588 (Ind.1992). Accordingly, the Court concludes that the tobacco barn is integral and essential to the production process of producing marketable tobacco, and Graham is entitled for an exemption for the materials purchased to remodel its tobacco barn.[5]

### 3. Rat Bait

■ Graham claims its purchases of rat bait are exempt because the bait is used to prevent rats from getting in the seed packages it stores before use. (*See* Trial Tr. at 39; Pet'r Ex. A at 5, 28.) The Department argues that because the rat bait is not used in the production process, it is not exempt. (*See* Resp't Br. at 10.) The Court agrees.

When the seed is in storage, Graham is producing nothing. Therefore, without production, Graham's assertion that "[t]he rat bait has a direct impact upon the environment or medium through which production occurs" is incorrect. (Pet'r Br. at 18.) Accordingly, Graham is not entitled to an exemption for its rat bait purchases. *See* 45 IAC 2.2–5–4(e) ("the fact that an item is purchased for use on the farm does not necessarily make it exempt ... [i]t must be directly used by the farmer in the direct production of agricultural products"). *See also* IND. ADMIN. CODE tit. 45, r. 2.2–5–7(d) (1992) (1996) (providing that a grain drying bin's storage structure is taxable because the "the storage of grain has no direct and immediate effect upon grain").

### 4. Grain Leg

■ Graham claims that items such as paint, stone, and mineral spirits used to maintain the grain leg of its grain handling operation are exempt. (*See* Pet'r Br. at 9; Pet'r Ex. A at 6.) The grain leg is the portion of the grain-drying operation that lifts the grain to the top of the tower where it is cleaned both at the time it goes into the grain bin and then again out of the bin for transport. (*See* Trial Tr. at 51.) Corya explained that the paint and mineral spirits were used to repair portions of the grain leg that had rusted and were no longer painted. (*See* Trial Tr. at 58, 60.) The stone was used to create a drive where trucks could pull up to be loaded under the grain spout. (*See* Trial Tr. at 122.)

Graham asserts "the grain leg and the driveway to the grain system are integral and essential to the processing of the grain and are therefore exempt." (Pet'r Br. at 18.) The Department claims that the paint, stone, and mineral spirits do not qualify for exemption because they "do not

---

5. Graham also seeks an exemption for amounts paid for labor in remodeling the tobacco barn. Labor, however, is generally not subject to sales and use tax. The Department has given no reason or authority for its imposition of tax on the labor, therefore, the Court REVERSES the Department's assessment of tax on the tobacco barn labor charges.

have an immediate effect upon the grain." (Resp't Br. at 11.)

■ The Department's regulations support Graham's contention that the grain leg itself is an essential part of the process of producing marketable grain. *See* 45 IAC 2.2–5–7(d) ("grain drying accessories of a grain drying bin are exempt, since such equipment is used to dry wet grain and, therefore, has a direct and immediate effect upon grain"). Nonetheless, the materials used to *maintain* the grain leg are not exempt because no evidence was presented demonstrating how the materials were used in the grain drying process. *See* 45 IAC 2.2–5–4(d)(7) (exempting repair parts necessary for the servicing of exempt equipment when the items are used directly in direct production"); 45 IAC 2.2–5–6(e)(3) (1992) (1996) ("[m]achinery, tools, and equipment used in general farm maintenance are taxable. The sale of ... [ ] sprays ... and other tools used in general cleaning and maintenances are taxable"). Similarly, the gravel used to pave the driveway is not exempt; while a driveway may be convenient for loading the stored grain into trucks, no production is occurring. *See* 45 IAC 2.2–5–4(e) ("the fact that a piece of equipment is convenient, necessary, or essential to farming is insufficient in itself to determine if it is used directly in direct production as required to be exempt").

### 5. Cattle Fence and Gates

■ Graham argues that fencing and gate supplies it purchased to confine its cattle are exempt. (Pet'r Br. at 9–10; Pet'r Ex. A at 7, 8, 22.) Graham also claims that an electric fence used to manage its pastures and segregate its cattle is also exempt. The Department claims that Graham failed to demonstrate that these supplies were used for confining cattle, and not merely for partitioning land.

At trial, Corya explained how Graham uses the fencing to separate newborn calves from older calves; calving cows from non-calving cows; and finished steers and heifers. (*See* Trial Tr. at 62–66.) He also explained how Graham always utilizes the fencing because its cows are either in the process of breeding, calving, gestating, or finishing. (*See* Trial Tr. at 75–76; Pet'r. Ex. B at 15–23.) With respect to the electrical fencing, Corya testified how it is used for "intensive grading"—a process that manages the pasture growth where the cows feed for more uniform grazing, and to further divide fence-confined cows. (*See* Trial Tr. at 67–68, 70–73.)

Graham's evidence sufficiently demonstrates that it uses the fencing and gate supplies in dispute for managing and confining its cows during the production process.[6] Therefore, Graham is entitled to an exemption for those expenditures. *See* IND. ADMIN. CODE tit. 45, r. 2.2–5–3(e)(3) (1992) (1996) (providing that the purchase of fences, fencing materials, gates, posts, and electrical fence charges are exempt it purchased for use in confining livestock during the production processes of breeding, gestation, farrowing, calving, nursing, or finishing); 45 IAC 2.2–5–3(e)(4) (exempting purchases of feeding and watering equipment used in the production process).

---

6. The Department claims that when it conducted the audit and was on the main farm property, it did not see fencing used to manage cows. Rather, the Department asserts that the fencing it observed was used primarily to define general land boundaries. (*See* Trial Tr. at 126.) The Department did concede, however, that it only looked at fencing on approximately forty-three acres of the 4,775 acres of the Graham farm operation. (*See* Trial Tr. at 128, 134–35.)

### 6. Bush Hog Power Take–Off

 Graham has been a no-till farm since 1959. (*See* Trial Tr. at 114.) As a no-till farm, Graham does not use any plows; it uses a bush hog to "knock the stalks down" prior to planting another crop. (Trial Tr. at 114.) It also uses the bush hog to "go over all of [the] pasture fields at least three times a year" to prevent the cows from getting "pinkeye" disease when grazing.[7] (*See* Trial Tr. at 114.) Additionally, Graham uses the bush hog on ground set aside in its land rotation under a Conservation Reserve Program (CRP) in which it participates. Under the CRP, if Graham sets aside acreage, it receives governmental price support for the crops produced on the remaining acres. (Trial Tr. at 117–119.)

Graham claims that the bush-hog power take-off shaft is exempt from sales and use tax because the bush-hog itself "is used to prepare the fields for no-till planting and to groom pastures where the cattle graze to protect them from disease." (Pet'r Br. at 20; Pet'r Ex. A at 33.) Because it claims the bush hog is exempt equipment, Graham asserts that the take off shaft connecting the bush hog to the tractor is also exempt. *See* 45 IAC 2.2–5–6(d)(5) (exempting the purchase of agricultural machinery to be "directly used by the purchaser in the direct production, extraction, harvesting, or processing of [ ] agricultural commodities"). The Department asserts that because the bush-hog is used on land when no crops were planted on it, no production is taking place, and the purchase

of the take-off shaft is therefore subject to tax. (Resp't Br. at 12.)

Preparing the fields for planting is essential to farming. For instance, Corya explained how Graham could not plant soybeans without first preparing the field with the bush-hog because when it would later need to combine the soybeans, the sickle would catch on the stalks if they had not been not cut down prior to planting. (*See* Trial Tr. at 114.) Similarly, in order to protect cattle from pinkeye disease, it is essential that the feeding pastures are periodically cleared of weeds. Accordingly, Graham is entitled to an exemption on the purchase of the take-off shaft equal to the percentage of time it uses the bush hog for clearing its field for planting and pastures used for feeding cattle. *See* 45 IAC 2.2–5–4(d)(4) (exempting the purchase of "[i]mplements used in the tilling of land ... including tractors and attachments"); 45 IAC 2.2–5–6(c) (exempting the purchase of agricultural machinery, tools, and equipment used directly in the direct production of agricultural commodities or livestock). Graham, however, is not entitled to the exemption for the percentage of time it uses the bush hog to clear fields as required to participate in the CRP program because no production is taking place.[8] *See* 45 IAC 2.2–5–4(e) ("the fact that a piece of equipment is convenient, necessary, or essential to farming is insufficient in itself to determine if its is used directly in direct production as required to be exempt").

### 7. Shop Supplies

 Graham operates a shop where it performs repairs and maintenance on its

---

7. At trial, Corya explained that cattle can develop "pinkeye disease problems" when they have to reach through weeds to feed on grass. (Trial Tr. at 114.)

8. The Court, in allocating Graham's exemption based on the percentage of time the bush-hog is used for an exempt purpose, incorporates a principle found in numerous sections of the Department's regulations. *See, e.g.,* 45 IAC 2.2–5–1(c)(3); IND. ADMIN. CODE tit. 45, r. 2.2–5–8(f)(4) (1992) (1996) (providing exemptions corresponding to the percentage of time an item was used for an exempt purpose).

farm equipment. During the years at issue, Graham purchased several tools and repair parts to use in maintaining its equipment. Graham claims that these purchases are exempt. *See* 45 IAC 2.2–5–6(c) (exempting the purchase of agricultural machinery, tools, and equipment used directly in the direct production of agricultural commodities or livestock); 45 IAC 2.2–5–4(d)(7) (exempting the purchases of "[g]rease and repair parts necessary for servicing of exempt equipment" when the items are used directly in the direct production of agricultural items). The Department claims that Graham's purchases are taxable because they are not used in the production process. *See* 45 IAC 2.2–5–6(e)(3) (stating that the purchase of "[m]achinery, tools, and equipment used in general farm maintenance" are taxable transactions).

Specifically, Graham requests exemptions for the purchase of: wrenches, gear-pullers, a bar set for tires, saw blades, Vise–Grips, wire brushes, air hoses, cable ties, grease gun, and the cost of a welder repair (collectively, the tools). (*See* Trial Tr. at 33–38, 83, 86, 109–10; Pet'r Ex. A at 5, 11, 13, 15, 24, 27.) With respect to these tools, Corya testified:

> Q: [D]o you [ ] use the things in the shop and the hand tools and so on to do maintenance of the farm equipment that is used to plant and harvest your various crops?
>
> A: Yes, ma'am.
>
> Q: [Please] describe … how these things are used in the maintenance, as opposed to just fixing breakdowns of equipment. .
>
> A: We have a policy on the farm … [w]e try to do our repairing and our maintenance directly after the equipment is being used.
>
> \* \* \* \* \*
>
> Q: So the parts that we looked at in the shop are used primarily for the maintenance of the equipment that you use on your farm. Is that correct?
>
> A: Yes, ma'am.

(Trial Tr. at 47–48.) [9] In addition, Corya described how the bar set (four-foot crow bar) was used to change tires in the shop and Vise–Grips were given to each employee on the farm for minor repairs such as fixing a strand of broken fence. (*See* Trial Tr. at 34, 38.)

Graham's evidence, however, fails to show how production could not have occurred without the use of the tools. In other words, without demonstrating how the tools are directly used in the direct production process, Graham is not entitled to the exemptions it seeks.[10] *See Indiana*

---

9. For example, Corya explained that when Graham is *finished* planting corn, it will "take the corn planter in the shop[ and] go meticulously through the corn planter to see if there's any worn parts on it or if there's anything out of adjustment, and [ ] will replace or adjust that at this time. When that planter comes out of the shop … it will go to a storage building, and … be ready … next spring[.]" (Trial Tr. at 47.) While this may be a sensible maintenance policy, at the point the planter finished planting corn, its role in the production process ceased.

10. The Court finds it worth noting that with respect to the wrenches, Graham claims they were "specialty tools" because some of its equipment could only be serviced with two types of metric wrenches. (*See* Trial Tr. at 33, 140.) However, no evidence was submitted demonstrating how the wrenches were used in the direct production process of agricultural commodities; tools are only exempt when used in the direct production process and have an immediate effect on the item being produced. *See* IND. ADMIN. CODE tit. 45, r. 2.2–5–6(c) (1992) (1996) (exempting the purchase of agricultural machinery, tools, and equipment used directly in the direct production of agricultural commodities or livestock).

*Dep't of State Revenue v. Cave Stone, Inc.,* 457 N.E.2d 520, 526 (Ind.1983) (holding that equipment was used in the direct production process when no production could have occurred without it); 45 IAC 2.2–5–6(c) (exempting the purchase of agricultural machinery, tools, and equipment *used in the direct production* of agricultural commodities or livestock).

■ Graham next requests exemptions for the purchase of fan belts, tire patching supplies, hydraulic hose repair supplies, and a tractor battery (collectively, the parts). (*See* Trial Tr. at 45, 80, 85, 92; Pet'r Ex. A at 9, 13, 15.) In support of these claims, Corya testified that Graham "repair[s] the [agricultural] machine when the fan belt breaks or when we have the machine in, doing normal maintenance. If we would see a fan belt that was showing excessive wear, even before it broke we would replace it." (Trial Tr. at 45.) Corya also explained how Graham repairs all of its own hydraulic hoses, which are on corn planters, drills used to plant soybeans, and combines. (Trial Tr. at 92.)

Graham's evidence has sufficiently demonstrated that it uses the parts to replace worn and broken parts on exempt machinery. *See Indiana Sugars, Inc. v. State Bd. of Tax Comm'rs,* 683 N.E.2d 1383, 1387 (Ind. Tax Ct.1997) (finding that the sworn testimony of a witness constituted sufficient evidence to prove the matter at hand). The Department presented no evidence contradicting this testimony. Therefore, Graham is entitled to an exemption for its purchases of these parts.

### 8. Miscellaneous Items

#### a. *Rope*

■ Graham asserts that the purchase of rope used to tie down tarpaulins on its "tarp buildings" is exempt because the tarpaulin protects the hay it stores. (*See* Trial Tr. at 94; Pet'r Ex. A.) Graham

claims that "[t]angible personal property used for the purpose of storing work-in-process is not subject to tax." (Pet'r Br. at 15.) Graham, however, provides the Court with no evidence demonstrating how hay is used in any of its production processes or produced for resale. *See* 45 IAC 2.2–5–6(d)(7) (stating that "[t]angible personal property used in or for the purpose of storing work-in-process or semi-finished goods is not subject to tax *if* the work-in-process or semi-finished goods are ultimately or completely produced for resale and are, in fact, resold") (emphasis added). Thus, the exemption is denied in this instance.

#### b. *Tarpaulin Cover for Wagon*

■ Graham asserts that it is entitled to an exemption for a tarpaulin (tarp) cover used on its bulk seed tender machine (seeding machine), which consists of a grain auger and seed wagon. (*See* Trial Tr. at 96–97; Pet'r Ex. A at 18; Pet'r Ex. B at 25.) At trial, Corya testified that the seeding machine is used to transfer seed into its planter or grain drill used to plant corn or soybeans. (*See* Trial Tr. at 96.) Corya explained that the tarp cover is specifically designed for the seeding machine and protects the seed from water, dust, and foreign objects that could obstruct the planter. (*See* Trial Tr. at 96–98.) The Department claims the tarp is a convenience and not necessary for Graham's planting process. (*See* Resp't Br. at 8.) The Department is incorrect.

Graham has presented sufficient evidence demonstrating how the tarp affects the grain in the planting process. Production cannot occur unless the grain is protected as it moves from storage to the field, and from the seeding machine to the corn planter or drill used for planting. *See Cave Stone, Inc.,* 457 N.E.2d at 526 (finding that because production of aggre-

gate stone could not occur without the transportation of crude stone from the quarry to the crusher, and crusher to stockpiles, the transportation equipment had an immediate effect upon the stone and qualified as exempt). *See also* 45 IAC 2.2–5–6(d)(9) (exempting "[m]achinery, tools, and equipment used to move exempt items such as seeds ... from temporary storage to the location where such will be used in an exempt process"). Consequently, Graham's purchase of the tarp cover for the seed wagon is exempt from tax.

### c. *Cordset Rod*

██ Graham claims it is entitled to an exemption for the purchase of a cordset rod (heavy duty extension cord) used to run a portable grain auger, which it claims is exempt because the auger is occasionally used to move grain out of the storage pit if a problem arises in the pit. (*See* Trial Tr. at 93; Pet'r Ex. A at 15; Pet'r Br. at 14.) However, Graham presented no evidence indicating how removing grain from storage with the portable auger is directly used in the grain production process. Agricultural machinery and equipment are only exempt if the equipment is used in "the direct production ... of grain." 45 IAC 2.2–5–7(a); *see also* 45 IAC 2.2–5–7(d)(2) (providing that an unloading auger is subject to tax). Thus, Graham is not entitled to an exemption for its purchase of a cordset rod.

### d. *Cleaning Supplies*

██ Graham claims it is entitled to exemptions for purchases of cleaning chemicals and supplies used "to clean parts of exempt equipment during the maintenance and repair thereof." (Pet'r Br. at 16; *see also* Pet'r Ex. A at 5, 13, 24.) The sale of tangible personal property to farmers is taxable unless the property is directly used in its agricultural production process. *See* 45 IAC 2.2–5–3(d)(1). Corya

explained at trial that when Graham finishes using a piece of equipment, it is brought in for maintenance and cleaned "even down [to] the tires." (Trial Tr. at 84.) Graham, however, presents no evidence that this cleaning occurs during any production processes; therefore, it is not entitled to an exemption for cleaning supplies used in its shop. *See* 45 IAC 2.2–5–4(e) ("[t]he fact that an item is purchased for use on the farm does not necessarily make it exempt from tax").

██ Nevertheless, Graham is entitled to an exemption for the purchase of glass cleaner it used to keep the windows of its combine clean while harvesting crops. (*See* Pet'r Ex. A at 13; Pet'r Br. at 16). Corya explained:

Basically, when you're combining soybeans it's a very dusty operation, and probably a half a dozen times a day you have to spray the[ ] front windows and side windows with the cleaner ... so that you can see to operate the equipment.

(Trial Tr. at 84–85.)

The Court finds such testimony sufficient to conclude that the glass cleaner is used in the soybean production process. Furthermore, the glass cleaner also has an immediate effect on the article being produced. *See* IND. ADMIN. CODE tit. 45, r. 2.2–5–13(g)(1) (1992) (1996) (stating that "[t]he consumption of property has an immediate effect on the commodity being produced or on the machinery, tools, or equipment engaged in direct production of commodities if the consumption is an essential and integral part of an integrated process which produces food or an agricultural commodity"). Indeed, without clear windows, the combine cannot be operated safely and the harvesting of soybeans from the field for further processing cannot occur. Accordingly, Graham is entitled to an exemption for its purchase of glass cleaner. *See* 45

IAC 2.2–5–13(a) (exempting the sale of tangible personal property as a material which is to be directly consumed in direct production by the purchaser in the business of producing agricultural commodities).

### Conclusion

For the aforementioned reasons, the Court AFFIRMS in part, and REVERSES and REMANDS in part, the Department's final determination. On re-

mand, the Department is ordered to refund the amount of sales and use tax Graham paid for the years at issue, plus any penalties and interest related thereto, consistent with this opinion.[11]

---

**11.** In its original tax appeal petition, Graham also disputes the Department's imposition of a negligence penalty. *See* IND.CODE ANN. § 6–8.1–10–2.1(a)(3) (West 2004) (providing that the Department may impose a ten percent (10%) penalty when a person "incurs ... a deficiency that is due to negligence"). This issue, however, was never addressed by Graham at trial, oral argument, or in its brief submitted before this Court. Accordingly, Graham is only entitled to a refund of the penalties and interest imposed against it with respect to the tax impositions reversed in this opinion. *See* A.I.C. § 6–8.1–10–2.1(d) (when a taxpayer can show that the deficiency determined by the Department was "due to reasonable cause and not due to willful neglect, the Department shall waive the penalty").